UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| MARTY L. LUKE, | ) | |
| --- | --- | --- |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | Case No. 1:09CV52 CDP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

# **MEMORANDUM AND ORDER**

Movant Marty L. Luke brings this case under 28 U.S.C. § 2255 seeking to vacate, set aside, or correct his sentence. Luke pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922 (g)(1) and was sentenced to the mandatory minimum term of 180 months imprisonment under the Armed Career Criminal Act, 18 U.S.C. §924 (e)(1). Criminal Case No.1:07CR178 CDP. Luke did not file a direct appeal.

Luke argues that his attorney during the criminal proceeding, Scott Tilsen, was ineffective because he failed to appeal Luke's sentence, failed to file a motion to suppress certain evidence, and failed to obtain a mental evaluation. In support of his motion, Luke contends that he was mentally incompetent to assist with his own defense or enter a guilty plea and that his attorney should have asserted his incompetence during the criminal proceeding. To resolve the issue of Luke's

competence, two experts – a forensic psychologist, Tanya L. Cunic, and a professor of psychiatry and psychology, C. Robert Cloninger – evaluated Luke and presented their findings at an evidentiary hearing. Luke and Tilsen also testified at the hearing.

After considering the parties' evidence and arguments, I conclude that Luke is not entitled to relief under § 2255. The evidence indicates that Luke was competent to assist his attorney with his defense and to plead guilty in the criminal proceedings. In addition, Tilsen did not provide Luke with ineffective assistance because Tilsen's failure to appeal, obtain a mental evaluation, or move to suppress evidence was not unreasonable given the circumstances and did not prejudice Luke.

**Background**

Beginning in early August of 2007, the police began to investigate Luke in connection with a string of burglaries. Witnesses reported seeing a brown truck near several of the burglary sites near the time of the burglaries. The police had observed Luke driving a similar brown truck. A witness also identified Luke in a photographic line-up as being near the scene of a burglary and driving a brown truck. Another witness described that a man matching Luke's description had come to her door and asked for someone named "Johnson" a few hours before a

burglary nearby.

During the investigation, the police observed tools commonly used in burglaries on Luke's front porch, including a pry bar, bolt cutters, and screwdrivers. The police noted that similar tools had been used during the burglaries. The police also followed Luke as he drove his brown truck to make brief stops at an associate's apartment, a pawn shop, and a bank, in quick succession. The pawn shop owner confirmed that Luke had sold the shop "scrap gold" for $250. The associate's apartment was searched on the morning of August 20, 2007 under a valid warrant and found to contain several pieces of stolen jewelry. Once the jewelry was identified as stolen, the police transmitted an order to detain Luke.

On the same day, Luke had suffered a head injury in an unrelated altercation. The police stopped Luke and his wife in connection with the burglaries after they had left the scene of the altercation in a blue car. Luke's wife was driving the car. Luke was removed from the vehicle, although at the time, the officer had not made the decision to formally place Luke under arrest. There are conflicting accounts of the events after the police stopped the blue car. The police claim that Luke and his wife consented to a search of the vehicle. Luke disputes that he gave consent. Nevertheless, the police searched the car and found jewelry matching the

description of jewelry stolen in the recent burglaries.  Luke was formally arrested and the police discovered several rounds of .38 caliber ammunition in his pocket during a search of Luke's person at the scene.

The police then asked to search Luke's truck, which was locked and parked several blocks away.  The police report indicates that Luke consented.  Luke denies that he gave consent or that he was capable of giving consent.  While approaching the truck, the police observed a box of .40 caliber ammunition on the seat.  After obtaining the keys from Luke, the police opened the driver's side door and found a .38 caliber revolver.  The police then took Luke to the hospital for treatment.

Luke claims that the head injury he received on the day of his arrest caused complete amnesia of the events of that day, as well as subsequent memory deficiencies.  At the hospital, Luke's head injury was classified as "minor."  He was diagnosed with a subarachnoid hemorrhage and, after a CT scan, Luke was assigned a Glasgow Coma Scale of 14.  The Glasgow Coma Scale measures a person's conscious state.  A score of 3 on the scale indicates that the subject is in a deep coma, while a score of 15 indicates that the subject is fully awake. Subsequent CT Scans revealed that Luke's injury had been fully resolved within two days.

After filing this motion challenging his sentence, Luke was examined by two

mental health experts. The experts based their opinions on Luke's medical history and a series of exams and observations, including a Validity Indicator Profile and the Minnesota Personality Inventory, as well as Luke's self-reported symptoms. Both experts found that Luke's responses included a large number of "rare" or "deviant" responses. Generally, this indicates that the subject is not cooperating with the test or that the subject is intentionally attempting to exaggerate his impairment – making the results unreliable. As a result, both experts based a portion of their opinions on their personal observations of Luke.[1] The experts first considered whether Luke's head injury affected his competence on the day of his arrest, as well as during the subsequent criminal proceedings. Both experts found that Luke's head injury may have had an effect on Luke's competency to consent to a search on the day of his arrest and may have contributed to continuing issues with memory loss. However, both experts agreed that Luke's head injury did not affect his competence after the physical injury was resolved two days after his arrest. They found that Luke would have been aware of his memory loss and

---

[1]Dr. Cloninger met with Luke two times in July of 2010 for a total of five hours and reviewed Luke's medical records for the period from 2005 to the present. Dr. Cunic observed Luke over the course of a seventy-five day period from September to December of 2009 while Luke was referred to a correctional institution in North Carolina. She met with him formally several times for a total of eleven hours. She also visited Luke informally during her rounds, Luke came to visit her, and she also received feedback about Luke's behavior from staff at the facility.

that he would have been able explain to his attorney that he did not remember his arrest and that his attorney should seek other sources of information about the events surrounding his arrest. The experts also found that his head injury did not affect his ability to distinguish between right and wrong or understand the consequences of his actions.

The experts then considered whether Luke's pre-existing mental disabilities and illnesses made him incapable of assisting in his own defense, understanding the charges against him, and understanding the consequences of entering a guilty plea. Neither expert claimed that Luke's mental disabilities made him inherently incapable of assisting with his defense or entering a valid guilty plea. Luke is 47 years old and has previously been convicted of numerous felonies. He has spent all but five years of his adult life in prison. Testing revealed that Luke is of average intelligence, although he has difficulty reading.[2] Luke reads at approximately the third-grade level and his verbal ability is below average, however, his nonverbal ability is average. When his scores are combined into a composite, his overall mental ability is within the range considered average.

Similarly, both experts found that, although Luke suffers from several mental illnesses, these illnesses do not inherently make him incompetent.

---

[2]The experts determined his intelligence using a variety of tests, including the KBIT-2.

Cloninger diagnosed Luke as suffering from paranoid schizophrenia, borderline personality disorder, antisocial personality disorder, dyslexia, and an unspecified mood disorder. Cunic disagreed that Luke suffers from schizophrenia and instead found that Luke suffers from an unspecified psychotic disorder. Cunic agreed that Luke suffers from borderline personality disorder, and antisocial personality disorder.

Luke's illnesses cause several symptoms, such as auditory hallucinations, depression, paranoia, and impulsiveness. Although Luke now claims that he has heard voices since he was eighteen, Cunic noted that Luke's medical records do not reflect any complaints of hearing voices until 2005. Luke says that the hallucinations take the form of the voices of family members. Occasionally the voices tell Luke to steal things or to engage in other behaviors. Both experts agree that Luke understands that these auditory hallucinations are not real and that he is able to resist the hallucinations without great difficulty.

Luke functions essentially normally when he is properly medicated. For instance, when medicated, his auditory hallucinations become barely audible, muffled noises instead of voices, and he is able to interact with others normally. Luke was appropriately medicated during his interviews with Cloninger and for part of the time in which he was observed by Cunic. During their examinations of

Luke, both experts found that Luke spoke clearly and at a normal rate, that he smiled and joked appropriately, and that he exhibited a normal mood. They also found that he was "oriented fully to time, place and person" and that, at the time of his examination, he understood the charges that were brought against him, that it was wrong for him to possess ammunition or a firearm because he was a felon, and he also understood the consequences of entering a guilty plea, and the nature of the claims that he is now asserting in his motion under § 2255.

Luke also acted normally at the evidentiary hearing, during which he was properly medicated. Luke was alert and engaged in the proceedings. He spoke intelligently about his case and understood the questions he was asked. He eagerly answered questions that helped his case and relatively artfully evaded questions that undermined his position. Several times, he was able to detect when the government attorney was attempting to catch him in an inconsistency and he was generally able to volunteer an explanation for these inconsistencies. He also demonstrated a fairly sophisticated knowledge of the legal system, including the distinction between the state and federal systems.

Luke claims that although he was provided medication throughout the criminal proceedings, he was given the wrong medication and he did not take some of his medication. The experts did not directly predict how much worse Luke's

symptoms would have been if he had not been taking his medication.  However, the evidence demonstrates that Luke's symptoms did not prevent him from functioning relatively normally, even when he was allegedly improperly medicated.

Luke was allegedly not on the proper medication for much of the period during which Cunic observed him.  He arrived at Cunic's facility in September, but his medications were not adjusted until November.  While his medications were unadjusted, Luke was able to function normally on the open unit, he interacted with staff and other inmates appropriately, he performed largely self-directed cleaning duties at the facility, and he acted on his own initiative to mentor new inmates.  During this period, he also demonstrated the ability to conform his behavior in order to avoid negative consequences.  When he was initially transferred to Cunic's facility, Luke had an outburst that led to his being confined in a locked unit.  After he had been in the locked unit for a few days, Cunic explained to him the consequences of his continued unacceptable behavior and Luke voluntarily conformed his behavior immediately.  He was able to function normally and without incident for the remainder of his stay at Cunic's facility.

In addition, Luke was also able to function normally and actively assist in his defense during the criminal proceedings, while he was allegedly un-medicated

or improperly medicated. Tilsen testified that Luke was alert and capable of understanding his options during each of his conversations with Luke. Tilsen stated that Luke understood the charges against him, that he understood he was not permitted to have ammunition or a firearm, and the penalty that he was facing. When Luke told Tilsen of his mental illnesses, they had a discussion about the benefits of seeking a mental evaluation and Luke ultimately decided that challenging his competence was not favorable. Similarly, when Luke told Tilsen that his attorney in his state case recommended that they attempt to suppress the evidence against Luke, Tilsen discussed with Luke the possibility of seeking a motion to suppress, but decided against filing the motion when Luke chose to plead guilty. Throughout all of these conversations, Tilsen never found that Luke was confused or acting irrationally.

The record of Luke's plea and sentencing hearings also indicate that Luke was able to function properly at that time. At each hearing, Luke was asked a series of questions to which he gave responses that were appropriate, internally consistent, and consistent with Luke's decision to plead guilty. Throughout the hearing, Luke never acted inappropriately or gave an inappropriate or inconsistent response that would indicate that he was confused or unaware of the importance of his statements.

Luke testified that he does not remember his plea or sentencing hearings at all. He also stated that he essentially does not remember any conversations with his attorney or the period leading up to his plea or his sentencing. He did, however state that he remembered telling Tilsen that he wanted to appeal his sentence when he was leaving the sentencing hearing. When questioned on this issue, Luke admitted that he does not actually remember telling Tilsen to appeal. Instead, he only remembered when another prisoner told him to remember telling his attorney to appeal. Tilsen denies that Luke told him that he wanted to appeal.

## Analysis

Luke moves to vacate his sentence by challenging the effectiveness of his counsel based on Tilsen's failure to obtain a mental evaluation, file an appeal, or move to suppress evidence. In order to establish that counsel provided ineffective assistance, movant must demonstrate that his counsel's performance was deficient and that movant suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Paul v. United States*, 534 F.3d 832, 836 (8th Cir. 2008). Luke has not shown that he suffered prejudice as a result of Tilsen's failure to file an appeal or obtain a mental evaluation. Luke has also not shown that Tilsen's decision not to seek a motion to suppress was unreasonable given the facts of Luke's case or that Luke suffered prejudice as a result.

### 1. Tilsen's Failure to Obtain a Mental Evaluation

Luke argues that Tilsen was ineffective for failing to obtain a mental evaluation during the criminal proceedings because Luke was not competent to assist with his own defense and he was not competent to enter a guilty plea. There are "two components to any ineffective-assistance claim: (1) deficient performance and (2) prejudice." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). An inquiry into Tilsen's performance on this issue is not necessary, however, because Luke has not demonstrated that a mental evaluation would have shown that he was incompetent. *See Williams v. Locke*, 403 F.3d 1022, 1025 (8th Cir. 2005) (stating that "we need not ask whether Williams's trial lawyer's performance was deficient if we can clearly determine that no prejudice resulted from his trial lawyer's alleged error."). In order to show prejudice caused by counsel's failure to obtain a mental evaluation or diagnosis "the evidence must do more than speculate that the petitioner may have been incompetent." *James v. State of Iowa*, 100 F.3d 586, 589 (8th Cir. 1996). Instead, it must demonstrate "some credible evidence of actual incompetence." *Id.* Simply showing that the defendant suffered from a mental disorder is insufficient to show that defendant was incompetent to waive his legal rights. *Anderson v. White*, 32 F.3d 320, 322-23 (8th Cir. 1994); *Smith v. Armontrout*, 865 F.2d 1502, 1506 (8th Cir. 1988). "The disorder must be one that

substantially affects the prisoner's capacity." *Smith*, 865 F.2d at 1506. A disorder substantially affecting defendant's rights prevents the defendant from understanding his position and making a rational decision. *Anderson*, 32 F.3d at 321-22.

Luke has not produced any credible evidence that he was incompetent during the criminal proceedings. There is no indication in the evidence from that time period that Luke was not capable of making a rational decision, despite his head injury or his mental illnesses. Tilsen spoke with Luke several times during the criminal proceedings, but never found that Luke could not make a rational decision or that he did not understand his circumstances. The court records from Luke's plea and sentencing hearings show that Luke behaved normally and responded to questions appropriately. Similarly, recent mental evaluations indicate that Luke would have been competent to assist with his defense and enter a guilty plea at that time.[3] There was no evidence presented to rebut the experts' opinions on this issue or Tilsen's recollection of the events of that time period. Therefore, any allegation that Luke was actually incompetent does not rise beyond the level of speculation. As a result, Luke cannot show that Tilsen's failure to obtain a mental

---

[3]Dr. Cunic found that Luke would have been able to assist in his own defense and, although Dr. Cloninger noted that there was some reason to doubt that Luke was entirely competent, he ultimately agreed that Luke was able to assist with his defense.

evaluation caused him prejudice, since Luke has not shown that it had any chance of being successful.

   2. **Tilsen's Failure to File an Appeal**

Luke also argues that Tilsen was ineffective for failing to file an appeal after he expressly asked Tilsen to appeal his sentence. The two pronged *Strickland* test requiring that movant show deficient performance and prejudice applies to claims "that counsel was constitutionally ineffective for failing to file a notice of appeal." *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000). Under this test, however, deficient performance and prejudice are shown if counsel "disregards specific instructions from the defendant to file a notice of appeal." *Id.* at 477.

In this case, there is no credible evidence indicating that Luke actually asked Tilsen to appeal. Since Luke received the mandatory minimum sentence, he had no meritorious basis for appealing his sentence and Tilsen testified that Luke did not ask to appeal his sentence. Although Luke testified that he asked Tilsen to appeal, he also admitted that he did not remember asking and only claims that he remembers now because someone else told him that he should. Given the fact that Luke also claims not to remember anything in the moments before or after his alleged request, I do not find his testimony credible. Luke provided no other evidence that he wished to appeal, such as a letter to his attorney. Based on the

evidence in the record and presented at the evidentiary hearing, Luke has not shown that Tilsen disregarded a specific instruction from Luke to file a notice of appeal.

### 3. Tilsen's Failure to Move to Suppress Evidence

Luke argues that Tilsen was ineffective for moving to suppress the evidence against him. When determining whether counsel performed ineffectively for failing to properly litigate a Fourth Amendment claim, counsel's competence "is presumed, and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Counsel's actions are considered from counsel's perspective at the time of the alleged error. *See id.* at 386-87.

Luke has not show that Tilsen's failure to file a motion to suppress the evidence against him was not sound strategy. Tilsen testified that he evaluated the police reports and believed that all of the evidence was probably admissible, especially the .40 caliber ammunition, which he believed was admissible because it was in plain view.[4] Despite the fact that he believed a motion would ultimately be

---

[4]Luke's indictment under 18 U.S.C. § 922 was based on the revolver found in his truck. However, even if the handgun that served as the basis of the indictment were suppressed, the government could have re-indicted Luke under the same statute for possession of either the .38 or .40 caliber ammunition. Therefore, Luke would have faced the same charges if any of the

-15-

futile, he discussed filing a motion to suppress with Luke. Tilsen believed that a motion would be beneficial, even if unsuccessful, if Luke insisted on going to trial because Tilsen believed he could use the officers' testimony at the suppression hearing against them at trial. However, when Luke chose to plead guilty, Tilsen believed that a motion would not be successful or beneficial and did not move to suppress the evidence. Luke does not criticize this strategy directly, but only asserts that the motion to suppress would have been successful if it had been filed and so Tilsen should have filed a motion to suppress. This conclusory argument does not demonstrate that Tilsen's failure to move for suppression – which included consulting with Luke, seeking Luke's opinion, and considering and presenting alternative strategies – was unreasonable.

Because Luke has not shown that his attorney's conduct was deficient, it is unnecessary to consider whether Luke was prejudiced. *See United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996) (stating that a claim for ineffective assistance of counsel fails if the movant does not show either one of elements of the *Strickland* test). But even if I consider the prejudice issue, Luke cannot succeed because he cannot show that "his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent

---

evidence against him were admissible.

the excludable evidence." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

First, Luke argues that the stop of the car in which he was riding was unlawful because there was no traffic violation. However, by the time the police stopped the car, they had probable cause to believe Luke had committed a string of burglaries, so there was no violation of Luke's Fourth Amendment rights. An officer has probable cause to make a warrantless arrest "when the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested." *United States v. Houston*, 548 F.3d 1151, 1154 (8th Cir. 2008) (internal quotations and citations omitted). The police knew that Luke possessed burglary tools, had been identified at the scene of several recent burglaries, and had sold stolen jewelry to a pawn shop, and the police had other evidence implicating Luke in a string of crimes. As a result, the stop of the car and the warrantless arrest were lawful, and the subsequent search of Luke's person that produced the .38 caliber ammunition was a valid search incident to arrest. *See United States v. Brewer*, 624 F.3d 900, 905 (8th Cir. 2010) (holding that the police need no additional justification to search a defendant's person following a lawful arrest.).

Similarly, Luke did not have a meritorious argument for suppressing either the .40 caliber ammunition or the firearm found in his empty truck. The police

reports indicated that Luke gave consent to search the truck. A search is valid under the Fourth Amendment if the defendant consented to the search. *See United States v. Barnum*, 564 F.3d 964, 969 (8th Cir. 2009). Although Luke now argues that he did not give consent, at the hearing he testified that he has no memory of the events of that day.[5] Therefore, if Luke had moved to suppress the .40 caliber ammunition, the court would have weighed the police's affirmative testimony that Luke had consented against Luke's testimony that he did not remember. This would likely not have been sufficient to support a factual finding that Luke did not consent to the search of his truck.

In addition, even if Luke had not consented, the evidence found in the truck would have been admissible. The .40 caliber ammunition was in plain view from outside the truck; upon seeing it, the police were justified in opening the door and searching the truck under the automobile exception. *See United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) ("As long as the law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception."); *United States v. Beatty*, 170 F.3d 811, 814 (8th Cir. 1999) ("Once Deputy Coop observed the holster, he was justified in entering the truck

---

[5]In addition, the minor head trauma Luke suffered that day is not sufficient to raise concerns regarding his competence to validly consent to a search.

and performing a limited sweep."); *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995).

Luke argues that the plain view doctrine cannot apply here because the incriminating nature of the ammunition box was not immediately apparent.[6] The police knew Luke was a convicted felon who had just been found with ammunition in his pocket and when they saw the ammunition box they could reasonably infer that it contained ammunition. Several court have reached similar conclusions under similar circumstances. *See United States v. Banks*, 514 F.3d 769, 774-76 (8th Cir. 2008); *United States v. Banks*, 514 F.3d 769, 773-74 (8th Cir. 2008) (warrant not required to open some containers if contents can be inferred from their outward appearance."); *United States v. Terry*, 400 F.3d 575, 580 (8th Cir. 2005); *U.S. v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) (acknowledging the incriminating nature of an empty box of ammunition); *United States v. Martin*, No. 90-631, 1991 WL 158748, at *2-3 (6th Cir. Aug. 19, 1991). The search of the truck, like the stop of the car and the search of Luke's person, did not violate the Fourth Amendment.

None of the evidence seized would have been suppressed, so Luke cannot

---

[6]The "plain view doctrine excuses the need for a warrant if the seizing officer is (1) lawfully in a position from which [to] view the object, (2) the incriminating character of the object is immediately apparent, and (3) the officer has a lawful right of access to the object." *PPS, Inc. v. Faulkner County, Ark.*, 630 F.3d 1098, 1103-4 (8th Cir. 2011).

show prejudice from his lawyer's decision not to file a motion to suppress.

Accordingly,

**IT IS HEREBY ORDERED** that movant's motion to vacate, set aside, or correct sentence [#1] is DENIED.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 10th day of June, 2011.